IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-00116-PSF-BNB

DIANA GARNER,

    Plaintiff,

v.

US WEST DISABILITY PLAN,

    Defendant.

---

**FINAL ORDER ON REVIEW OF ADMINISTRATIVE RECORD**

---

    This is a case arising under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").  Plaintiff Diana Garner claims that Defendant US West Disability Plan ("Plan"), now Qwest Disability Plan, violated ERISA when it terminated her long term disability ("LTD") benefits on March 4, 2004, effective April 1, 2004.  Ms. Garner seeks an order from this Court awarding her past benefits and instructing the Plan to approve her continuing claim for LTD benefits.  Defendant urges this Court to affirm its decision on benefits and to dismiss plaintiff's claim.

**I. PROCEDURAL HISTORY**

    Ms. Garner filed her complaint on January 24, 2005, bringing one claim for relief under ERISA for recovery of benefits.  Defendant Plan filed an answer on February 23, 2005.  Parties jointly filed the Plan Documents (Dkt. # 9) with the Court on April 4, 2005.  At a scheduling conference on April 12, 2005, this Court ordered parties to file simultaneous opening briefs on June 10, 2005, with response briefs due on June 30, 2005, as the determination of Ms. Garner's ERISA claim would be made based on a

review of the administrative record. For reasons not apparent from the record, plaintiff and defendant filed their briefs on June 16, 2005 (Dkt. # 13) and June 15, 2005 (Dkt. # 12), respectively. (Defendant actually filed a motion for summary judgment (Dkt. # 11) along with its brief.) Defendant also submitted Exhibit A, referred to by both parties as the "Qwest/Garner Record" and numbered 0001-0225. This serves as the administrative record for the case and will be referred to by the Court by page number and the designation "AR." Also pending before the Court is defendant's Motion to Strike Plaintiff's Exhibit 9 (Dkt. # 21) and plaintiff's Motion to Strike (Dkt. # 22). These motions, as well as the parties' opening briefs, are ripe for determination.

## II. FACTUAL BACKGROUND

Ms. Garner, a person diagnosed with rheumatoid arthritis ("RA"), was an employee with U.S. West (now Qwest) from 1969 through 2000, with a brief absence for maternity leave. In 2000, at the age of 48, Ms. Garner stopped working and applied for and received short term disability benefits. After exhausting short-term disability benefits, she began receiving LTD benefits on January 29, 2001, retroactive to December 29, 2000. AR 0207. Her receipt of LTD benefits followed an LTD Plan claim reviewer's certification on January 17, 2001 that Ms. Garner was disabled from "any and all work." AR 0216. The claim reviewer noted that no improvement was expected, and the claim should be reviewed again in one year. *Id.* The Plan, through its Third-Party Administrator ("TPA"), continued to conduct annual reviews of her disabled status.

The Plan's definition of disability distinguishes between the first year of disability and thereafter:

> For purposes of LTD benefits, a Participant is initially considered
> Disabled if he is unable to perform his last Company-assigned job.  After
> a Participant receives LTD benefits for one full year, the Participant is
> considered Disabled if he is unable to engage in any occupation or
> employment for which he is qualified, or may reasonably become qualified
> by training, education or experience, other than one which pays less than
> 60% of Base Pay at the time he became Disabled.

AR 0001.  On February 27, 2002, after paying benefits for more than one year, the TPA approved the continuation of Ms. Garner's LTD benefits.  AR 0202.

In March of 2003, Ms. Garner's treating physician, Dr. Stuart Kassan, submitted to the TPA documentation supporting her disability.  AR 0030, 0033.  Dr. Kassan indicated that Ms. Garner was "totally disabled from any occupation," AR 0033, and that he permanently restricted her to "rarely" performing several listed extremity functions, *i.e.*, simple grasping, fine manipulation, keyboarding, pushing/pulling and reaching.  AR 0030.  Dr. Kassan noted that Ms. Garner's full capacity for sitting and speaking was only two hours during an eight-hour work day, and only one hour for standing, walking and using a computer screen.  *Id.*  At the same time, Ms. Garner's psychiatrist, Dr. Neil Weiss, submitted documentation of Ms. Garner's alleged mental illness and attendant impairments.  AR 0031-32.

In a subsequent phone call by the Plan on April 1, 2003, however, Ms. Garner revealed that she had been given no physical restrictions by Dr. Kassan, and that he wanted her to do everything she could.  AR 0013.  Following this revelation, the TPA requested plaintiff to submit to an Independent Medical Examination ("IME"), as provided for in the Plan.  AR 0158-59.

Ms. Garner visited Dr. Kenneth Glassman, a rheumatologist, on August 28, 2003 at the Denver Arthritis Clinic.  *See* AR 0065, 0067-70.  Dr. Glassman's report,

submitted to the TPA on September 29, 2003, confirmed her diagnosis of RA and noted that it was "well controlled on her present regimen of methotrexate and Remicade, but she is also not working." AR 0068. Dr. Glassman noted that on the basis of his examination, "it is difficult to argue that she cannot return to some occupation on the basis of her diagnosis of [RA]. It is also worth noting that repetitive activity on a regular basis can precipitate and exacerbate an underlying rheumatoid process." AR 0068-69. He stated that he believed "significant debilitating fatigue" to be "a more significant factor precluding her from engaging in any occupation at this time." AR 0069. In reviewing Dr. Kassan's evaluation, Dr. Glassman found that Ms. Garner "is able to do simple grasping and fine manipulations . . . [although] repetitive activity likely can worsen" her condition. *Id.* He concluded that a functional capacity evaluation ("FCE") would be "very appropriate in assessing Ms. Garner's ability to return to work." *Id.*

The TPA thereafter requested plaintiff to submit to an FCE conducted by HealthSouth, specifically Exercise Physiologist Kimberly McDermott and Physical Therapist Adam Brown, on February 12-13, 2004. *See* AR 0143, 0039-40. Results of the FCE indicated that Ms. Garner "would be capable of working in a LIGHT physical demand category for an eight hour day based on her physical/functional abilities." AR 0040. The evaluators further noted that Ms. Garner exhibited some "inconsistencies," indicating that her results may be the result of "submaximal rather than her maximal effort." *Id.*

Based on the FCE results, the TPA had a transferable skills analysis ("TSA") conducted later that month, which indicated that someone with her abilities who is cleared to work in the "light physical demand" (*see* AR 0040) category could perform a

number of jobs at her "target wage rate" (60% of her pre-disability wage). AR 0125-31. Following the TSA, plaintiff received a letter dated March 4, 2004 terminating her LTD benefits. AR 0027-29, 0137-40. The denial letter noted that the IME physical examination revealed no active inflammation and full range of motion. AR 0027. Further, no objective evidence prevented plaintiff from speaking or sitting for two hours or utilizing a computer screen for one hour. AR 0027-28, 0137-38. The letter detailed the FCE results as well as the occupations identified by the TSA, and stated that Ms. Garner's claim had been denied pursuant to provisions 5.1(a) and (b) and 5.7 of the Plan (defining disability and requiring supporting documentation). AR 0028-29, 0138-39.

Ms. Garner timely appealed this denial. AR 0021-26. The Plan issued a final denial to Ms. Garner on October 8, 2004, again citing provisions 5.1(a) and (b) and 5.7 of the Plan. AR 0001-2. The final denial letter again summarized the IME, FCE and TSA results, and concluded that "[t]here is no medical support for total disability." AR 0002. This suit followed.

### III. PARTIES' CONTENTIONS

Essentially, plaintiff contends that the denial of her LTD benefits was arbitrary and capricious, and thus in violation of ERISA. More specifically, she alleges that the Plan failed to reasonably consider the findings and opinions of her treating doctors, including Drs. Kassan and Weiss. The FCE, by ignoring these findings, allegedly produced unreasonable results, also tainting the TSA based upon the FCE. Further, plaintiff alleges the Plan was operating under a conflict of interest when reviewing her claim, contending that the TPA had a financial incentive to deny her claim. Defendant

denies any conflict of interest, characterizes the decision to discontinue benefits as reasonable, and maintains that it was supported by substantial evidence and not an abuse of discretion.

## IV.  STANDARD OF REVIEW

Parties both admit that the ERISA Plan at issue gives defendant, as plan administrator, discretionary authority to determine eligibility for benefits.  *See* Pl.'s Op. Br. at 6; Def.'s S.J. Br. at 11.  Therefore, this Court must apply an "arbitrary and capricious" standard of review.  *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997, 1003 (10th Cir. 2004), *cert. denied*, 125 S.Ct. 1972 (2005).  However, when a plan administrator is operating under a conflict of interest, a less deferential standard of review is warranted.  *Id*.  The Tenth Circuit, in determining how to apply this less deferential standard, has adopted the "sliding scale" approach in which the court applies the arbitrary and capricious standard but  "decrease[s] the level of deference given to the conflicted administrator's decision in proportion to the seriousness of the conflict."  *Id.* at 1004.

The plaintiff bears the burden of proving the existence of a conflict of interest. *Id.* at 1005.  Here, as defendant admits, the Plan is self-funded and administered by the TPA, hired by Qwest Communications International, Inc., successor to US West, Inc. Def.'s S.J. Br. at 12.  *Fought* specifically lists such circumstances as factors to be considered in determining whether a conflict exists.  *Fought*, 379 F.3d at 1005.  On their own, such circumstances have been described as constituting a "standard conflict of interest" by the Tenth Circuit, and "the burden of proof is on the plaintiff to prove the existence of the conflict and to prove that any such conflict jeopardized the

administrator's impartiality." *Wolberg v. AT&T Broadband Pension Plan*, 2005 WL 23683 *4 (10th Cir., Jan. 6, 2005).

Here, plaintiff argues that a proven conflict exists because "the compensation of the Plan's two relevant outside administrators . . . was linked to the number of LTD claims denied." Pl.'s Op. Br. at 8. Plaintiff claims that an agreement providing for a flat fee for LTD administration created an incentive for the TPA to deny benefits, thereby decreasing its administration costs and increasing its profits. *Id.* at 8-9.

Defendant contends that no evidence supports plaintiff's contention that it is administratively less expensive to deny a claim than to approve one. Def.'s Resp. at 7. The costs of denial–conducting IMEs, FCEs, and TSAs as well as participating in administrative appeals and litigation–are "considerable," and plaintiff has produced no evidence as to how denials actually relate to expenses. *Id.* at 8. The Court agrees and determines that plaintiff has failed to carry her burden to establish an actual conflict of interest on the basis of the fee arrangement. *See Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan*, 379 F.3d 1168, 1176 (10th Cir. 2004) (finding no conflict of interest where plaintiff offered no evidence to show TPA paid by flat fee arrangement actually saved money by denying claims; a "general motivation" to reduce the number of approved claims "without more, is insufficient to rise to the level of a legally cognizable conflict of interest").

Plaintiff also claims that serious procedural irregularities are present, justifying a slide along *Fought*'s arbitrary and capricious scale. *See* Pl.'s Op. Br. at 10; *Fought*, 379 F.3d at 1007. Plaintiff spends considerable time in her opening brief accusing defendant of withholding relevant documents during the appeal process,

misrepresenting facts in the initial denial letter of March 4, 2004, and removing documents from the administrative record.  Pl.'s Op. Br. at 11-23.

Under ERISA, a Plan must accord every participant denied benefits a "full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133(2).  Such a review requires that a Plan provide all documents "relevant to the claimant's claim for benefits."  29 C.F.R. § 2560.503-1(h)(2)(iii).  Here, plaintiff alleges that she was denied two relevant documents:  a TSA conducted in 2003 and a running log of activity on her case.  Pl.'s Op. Br. at 12.  Defendant essentially contends that neither of these documents is relevant to Ms. Garner's claim for benefits–the 2003 TSA was outdated and the activity log was immaterial as it simply logged the administrative tasks of the claims examiner.  Def.'s Resp. at 5-6.  Further, neither of the documents, according to defendant, played a role in the decision to deny LTD benefits.  Without determining the documents' relevance for purposes of § 1133, the Court finds the omissions here insignificant and undeserving of a slide down the *Fought* scale.  Considerable evidence exists in the record to support defendant's position that neither the 2003 TSA nor the activity log played a role in Ms. Garner's denial of benefits.  *See Hickman v. GEM Ins. Co.*, 299 F.3d 1208, 1215 (10th Cir. 2002) (finding "[s]ubstantial compliance with the requirements of § 1133" sufficient and holding that a violation of § 1133 will not affect a denial of benefits if "it appears the administrator or fiduciary was correct in its decision").

Plaintiff contends that the Plan engaged in "the worst kind of cherry picking of results" when it failed to include certain portions of Dr. Glassman's IME.  Pl.'s Op. Br. at 14. However, the entire IME was available to Ms. Garner during her appeal, not just

8

the sections highlighted in her denial letter.  Further, she presents no evidence that the Plan ignored the excluded language in denying her claim the first time or on appeal.  The denial letter does not represent a "manipulation of results" as plaintiff contends at 14 of her opening brief, but rather represents an explanation of key factors that went into denying her claim.

Finally, plaintiff argues that the Plan removed important documents from its claim file submitted to the Court as the administrative record.  *Id.*  The Court first notes that some of the missing documents were later acknowledged by plaintiff to have been part of the record.  *See* Pl.'s Resp. at 10.  Second, the Court has reviewed the administrative record and finds no evidence of purposeful irregularities or omissions that would warrant a less deferential standard of review.  The additional missing documents claimed by plaintiff in her response to defendant's brief are not particularly relevant to the LTD benefits denial in March 2004–the activity log (documenting administrative activity) from June 8, 2004 through October 8, 2004 and a report of an IME conducted on December 29, 2000.  Therefore, the arbitrary and capricious standard applies, which means that the Plan's decision "need not be the only logical one nor even the best one. . . .  The decision will be upheld unless it is not grounded on *any* reasonable basis."  *Nance v. Sun Life Assur. Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002) (emphasis in original); *see also Fought*, 379 F.3d at 1003 (court's review is limited to determining whether plan administrator's interpretation was reasonable and made in good faith).  Thus, there is no basis for sliding down the arbitrary and capricious scale to diminish the deference that should be accorded the Plan's decision-making.

## V. ANALYSIS

### A. Alleged Misrepresentations in the Denial Letters

Ms. Garner first argues that the denial of LTD benefits was arbitrary and capricious because both the March 2004 and October 2004 denial letters misrepresent the evidence in the claim. Pl.'s Op. Br. at 24-29. The March denial letter identifies employment opportunities for Ms. Garner that "accommodate [her] restrictions as stated by [her] providers." AR 0028. Plaintiff contends that her "providers"–Dr. Kassan and Dr. Weiss–imposed restrictions not accommodated by the listed occupations. Dr. Kassan's restrictions in particular limited plaintiff to two hours of sitting, one hour of standing, and one hour of walking in a given eight hour work day. *See* AR 0030. While plaintiff offers a reasonable reading of Dr. Kassan's evaluation, its reliability was undermined by plaintiff's own admissions that she had no restrictions placed on her by Dr. Kassan, and the FCE, which concluded she could engage in a light work category for eight hours per day. *See* AR 0013, 0040. Therefore, although the wording of the March denial letter may have been inaccurate, such an error does not indicate an arbitrary or capricious denial. Rather, in the context of the administrative record, the Court reads the language in question as communicating that the identified employment opportunities accommodate her restrictions to the extent that such restrictions were verified by the IME and FCE.

The October denial letter allegedly made further misrepresentations. Pl.'s Op. Br. at 28. First, the letter stated that "[n]one of the objective evaluations obtained denote any significant functional loss." AR 0002. Ms. Garner contends that the "significant debilitating fatigue" found by Dr. Glassman in his IME represented a

10

significant functional loss. *See* AR 0069. Plaintiff's characterization of what constitutes "significant functional loss," though reasonable, does not make defendant's characterization arbitrary. The FCE provides objective evidence that Ms. Garner's functional loss is not "significant" in the sense that she is totally disabled within the meaning of the Plan. *See* AR 0040.

Plaintiff also challenges the October letter's statement that "IME and FCE fail to find evidence of disability," AR 0002, pointing out that the IME specifically states that Ms. Garner suffers from "significant debilitating fatigue." AR 0069. Such a finding, however, does not represent evidence of disability within the meaning of the Plan, which states that an employee is disabled only if she is unable to engage in any occupation or employment for which she is qualified, or may reasonably become qualified by training, education or experience, other than one which pays less than 60% of base pay at the time she became disabled. *See* AR 0001. Defendant does not dispute that Ms. Garner suffers from arthritis, and does not appear to challenge her contention that she suffers from significant fatigue. However, in the absence of evidence to the contrary, the Plan does not act arbitrarily or capriciously by apparently distinguishing between an ailment that may be significantly debilitating and a disability as that term is carefully defined by the Plan. Plaintiff cites no case law for the proposition that such factual characterizations as those contained in her denial letters are evidence of an arbitrary and capricious denial by the Plan.

### B. Alleged Unreliability of the FCE

Ms. Garner alleges that the FCE is unreliable because it "does not indicate what information was provided by the Plan." Pl.'s Op. Br. at 44. However, plaintiff provides

11

no basis for this Court to find that the FCE depended on outside medical information or diagnoses, as it was an evaluation in and of itself of her physical capabilities. Plaintiff also attacks the conclusions as unreliable in light of her actual performance during the FCE. *Id.* at 46-50. The FCE itself, however, presents objective reasonable evidence upon which the two independent professionals conducting the FCE presumably relied in determining Ms. Garner's functionality. *See* AR 0039-55. Although Ms. Garner would interpret her performance differently, the FCE evaluators' interpretation appears to be reasonably based on the evidence available. Importantly, the evaluators specifically noted that her performances were inconsistent, which may demonstrate "her submaximal rather than her maximal effort." AR 0040. Thus, her poor performances on certain tests could have been reasonably construed as potentially yielding more positive functionality conclusions had she put forth greater effort given her performances on other tests.

Plaintiff argues that such speculation is unreasonable in light of Dr. Kassan's orders, shared with the FCE professionals, to cease activity "[i]f she develops increasing pain or increasing fatigue." AR 0056. This restriction, however, does not appear to contradict a finding of apparent submaximal effort at times–presumably, Ms. Garner's increasing pain or fatigue would occur at relatively uniform points in the examination, yielding consistent results. *See* AR 0047-55. Plaintiff's arguments regarding the FCE do not support a finding of arbitrary and capricious action by the Plan.

### C. Alleged Unreliability of the TSA

Plaintiff contends that because the Plan "selectively provided information to the company performing the TSAs [and] withheld vital information from it," the resulting TSA is unreliable and the Plan's reliance on it is arbitrary and capricious. Pl.'s Op. Br. at 32. Defendant admits that the TSA analysis was based only on the FCE. Def.'s Resp. at 22. Although the Court has determined that the FCE itself is not unreasonable, a Plan's failure to provide additional medical records, especially the IME, is potentially unreasonable. *See Spangler v. Lockheed Martin Energy Systems, Inc.*, 313 F.3d 356, 362 (6th Cir. 2002) (where plan provided only a single physical capacities evaluation to be used in conducting a TSA; such action was "arbitrary and capricious" and plan should have provided "all medical records relevant to [claimant's] capacity to work" to entity conducting TSA). However, the FCE in this case is not "somewhat aberrant" as compared to all other medical evidence, as was the single record produced in *Spangler*. *Id.* Further, there is no evidence that providing the additional documents would have produced a different TSA result. Most importantly, the TSA was only part of the record relied upon by the Plan in deciding to deny LTD benefits. *See* AR 0002 (discussing denial on the basis of the IME and FCE without mention of the TSA). As *Spangler* notes, in an ERISA denial of benefits case, the ultimate issue "is not whether discrete acts were arbitrarily and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." 313 F.3d at 362. The Court cannot say that the Plan's decision was arbitrary and capricious due its failure to provide additional relevant medical records to the TSA firm.

### D. Alleged Misrepresentation of Reasons for Denial

In her response to defendant's summary judgment motion, Ms. Garner contends that defendant improperly asserts that the denial of benefits was based on a finding of insufficient objective medical evidence of disability. *See* Pl.'s Resp. at 2 (citing Def.'s S.J. Br. at 17). However, plaintiff misreads defendant's statement that "the record did not present sufficient objective medical evidence to support Plaintiff's claim that her physical limitations precluded her from working in any occupation earning at least sixty percent (60%) of her pre-disability pay." Def.'s S.J. Br. at 17. The Court understands the defendant to mean that the denial was based, as stated in Ms. Garner's denial letters, on the IME, FCE and TSA, which together showed that Ms. Garner was not disabled within the meaning of the Plan. Defendant considered "Plaintiff's claim that her physical limitations precluded her from working," *id.*, but found the evidence to the contrary to be more persuasive. Based on the administrative record presented, such a finding cannot be said to be arbitrary and capricious at least as to plaintiff's alleged physical disability.

### E. Alleged Failure to Consider Mental Disability

Lastly, plaintiff argues that the Plan's failure to consider her depression as a disability within the definition of the Plan rendered its denial of benefits arbitrary and capricious. The administrative record reflects that Ms. Garner was considered by the Plan based on claim information to be suffering from major depression. *See* AR 0148. Further, Dr. Weiss, Ms. Garner's psychologist, provided the Plan with a "Mental Health Functional Capacity Evaluation" dated March 21, 2003. AR 0031-32. The form, completed by Dr. Weiss, states at the top: "IT IS NOT NECESSARY TO COMPLETE

THIS FORM IF THE PATIENT DOES NOT HAVE A MENTAL ILLNESS." AR 0031.  On the form, he noted that Ms. Garner could not remember past events and name the last four presidents.  *Id.*  The form reflects his diagnosis that she was moderately to severely impaired in several areas, including her ability to relate to co-workers and managers, deterioration in her personal habits/hygiene, ability to comprehend, follow and remember instructions, respond appropriately to supervisors, respond to usual work pressures, perform simple tasks (such as answer phones, clerical, sort/file, e-mail), perform complex tasks (such as speak with customers in sales) and perform varied tasks.  AR 0032.  Dr. Weiss also indicated that there was no evidence of work avoidance, malingering or secondary gain by plaintiff.  AR 0031.  Despite this evidence of such potentially disabling depression, the Plan did not request an IME with a mental health specialist, and did not otherwise follow up on Ms. Garner's mental condition.

The Plan contends that it did not need to credit Dr. Weiss's "cursory statements of disability," "absent other medical evidence."  Def.'s Resp. at 13.  Further, the Plan interprets Dr. Weiss's opinion as reflected in the submitted form as "not support[ing] a conclusion that Plaintiff is precluded from working as a result of her depression."  *Id.*  However, by the Plan's very terms, Ms. Garner need not be precluded from working at all, she need only be precluded from working in a position for which she is or can be qualified and that pays 60% of her base salary.  *See* AR 0001.  The Plan did not conduct an IME or FCA on the basis of her mental disability in order to determine her ability to work.  Such an investigation was unwarranted, according to the Plan, as plaintiff failed to meet her burden to provide objective evidence such as treatment notes from Dr. Weiss that could justify reliance on his opinion.  Def.'s Resp. at 13-14 & n.8.

15

Although the Plan does require a participant to provide supporting documentation in order to receive LTD benefits, the administrative record does not reveal any evidence suggesting that the Plan ever informed Ms. Garner that her failure to produce such documentation resulted in a denial of LTD benefits on the basis of depression.  Rather, the denial letters do not mention her mental disability at all.  The Plan's assertion that "[d]espite requests for further information" plaintiff failed to provide adequate documentation, see Def.'s Resp. at 13, is arguably disingenuous, where the request it identifies appears to have been sent to medical providers and not Ms. Garner herself and preceded Dr. Weiss's submission.  See AR 0180-81.  No follow-up request was apparently ever made.

       The Plan's apparent discounting or rejection of Dr. Weiss's opinion, in the absence of other evidence of Ms. Garner's mental condition, is arbitrary and capricious. *See Smith v. Reliance Standard Life Ins. Co.*, 322 F. Supp. 2d 1168, 1178 (D. Colo. 2004) (where defendant Plan gave "little or no weight" to opinions of two treating physicians, "barely mentioning them in the denial letters," such opinions were "arbitrarily ignored").  Further, the failure to inform plaintiff that her lack of documentation resulted in a denial of LTD benefits on the basis of her mental disability violates ERISA's requirement that the Plan state specific reasons for its denials.  29 U.S.C. § 1133(1); *see also Gather v. Aetna Life Ins. Co.*, 388 F.3d 759, 774 (10th Cir. 2004) (ERISA requires "a meaningful dialogue between ERISA plan administrators and their beneficiaries.  If benefits are denied . . . the reason for the denial must be stated in reasonably clear language, . . . [and] if the plan administrators believe that more information is needed to make a reasoned decision, they must ask for it.") (quoting

*Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 635 (10th Cir. 2003) (emphasis omitted; ellipsis and brackets in original)). The proper remedy here, where "an ERISA administrator fails to make adequate findings or to explain adequately the grounds of her decision[,] is to remand the case to the administrator for further findings or explanation." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002); *see also Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 789 (4th Cir. 1995) ("If the evidence before the plan administrator is inadequate, the district court should remand the case to the administrator to receive additional evidence and to make a new determination."). Therefore, the denial of LTD benefits on the basis of Ms. Garner's mental condition either alone or in conjunction with her physical impairments must be remanded to the Plan for further findings or explanation in accordance with its obligations under ERISA.

## VI. MOTIONS TO STRIKE

Both parties seek to strike exhibits attached to the other's position brief. Defendant seeks to strike plaintiff's Exhibit 9 (Dkt. # 21) and plaintiff seeks to strike certain affidavits (Dkt. # 220). Because the Court has determined that a remand to the plan administrator is appropriate here without relying on or referencing the exhibits subject to the motions, both motions are DENIED as moot.

## VII. CONCLUSION

For the reasons set forth above, the Court ORDERS that the case is REMANDED to the Plan for further administrative review as to plaintiff's claim for disability based on her alleged major depression, by itself or in conjunction with her physical ailments. Defendant's Motion for Summary Judgment (Dkt. # 11) is GRANTED

in part and DENIED in part accordingly; defendant's Motion to Strike (Dkt. # 21) is DENIED as moot; and plaintiff's Motion to Strike (Dkt. # 22) is DENIED as moot. The Clerk of the Court is directed to ADMINISTRATIVELY CLOSE this case subject to reopening only upon motion for good cause shown pursuant to  D.C.COLO.LCivR 41.2.

DATED: March 31, 2006

BY THE COURT:

*s/ Phillip S. Figa*
_____
Phillip S. Figa
United States District Judge